Filed 9/14/23  Owosen Motorsports Group v. TBE Tour Consultant Corp. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OWOSEN MOTORSPORTS GROUP, INC.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TBE TOUR CONSULTANT CORPORATION et al.,<br><br>    Defendants and Respondents. | B314076<br><br>Los Angeles County<br>Super. Ct. No. BC544747 |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Stuart Rice, Judge. Judgment reversed in part with directions, affirmed in part. Appeal from order dismissed in part, affirmed in part.

Ferguson Case Orr Paterson, Wendy C. Lascher, and John A. Hribar for Plaintiff and Appellant.

Meylan Davitt Jain Arevian & Kim, Raymond B. Kim, and Grace C. Lee for Defendants and Respondents.

# INTRODUCTION

Plaintiff and appellant Owosen Motorsports Group, Inc. (Owosen) appeals a judgment entered following a trial before a judicial referee under Code of Civil Procedure[1] 638, as well as the referee's post-judgment order denying Owosen's motions for new trial and to set aside the judgment. Owosen entered into two contracts with TBE Tour Consultant Corporation (TBE) and Hong Liu, respectively, pursuant to which Owosen provided tour buses to TBE and Liu, who operated a tour bus business. Liu's ex-wife, Betty Qi, also assisted in the management of TBE. Owosen filed suit against TBE, Liu, and Qi (together, the defendants) after the contractual relationship between Owosen, TBE, and Liu fell apart. At trial, the parties presented vastly different interpretations of the contracts between them and the allocation of expenses and profits. The referee did not entirely adopt either side's interpretation. However, he awarded damages of $64,438.83 in TBE's favor and against Owosen under the parties' first contract and awarded no damages to Owosen with respect to the second contract.

On appeal, Owosen does not challenge the referee's interpretation of the contracts but contends that the referee made several fundamental errors in the calculation of damages that resulted in a decision unsupported by the evidence. Owosen argues that the referee's primary error was his exclusion of entire categories of operating expenses from his analysis. We agree with Owosen that the referee's exclusion of payroll, payroll tax, workers' compensation, and insurance expenses from the

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

calculation of damages for the parties' first contract was inconsistent with the measure of damages the referee adopted, unsupported by substantial evidence, and did not reasonably approximate damages. We therefore reverse the judgment in part with instructions to award damages against TBE and in favor of Owosen in the amount of $44,537.83. We otherwise affirm the judgment.

The appeal of the motions for a new trial and to set aside the judgment is dismissed as moot with respect to Owosen's challenge of the referee's exclusion of payroll, payroll tax, workers' compensation, and insurance expenses from the calculation of damages. We affirm the referee's order denying the motions in all other respects.

## FACTS AND PROCEDURAL BACKGROUND

### 1. Factual Background

Feng Jun (Frank) Zhang was born in China and lived there most of his life, though he now primarily resides in the United States. He came to the United States to be closer to his son, Jian (John) Zhang[2], and because his wife needed medical treatment. At the time of the hearing, Frank was in the process of obtaining permanent residency status through the EB-5 Immigrant Investor program, which requires a significant investment in the United States economy. He decided to make a direct investment

---

[2] We follow Owosen's convention in its briefing below and on appeal and refer to Feng Jun Zhang and Jian Zhang as Frank and John in this opinion. Because Frank and John share the same last name, we refer to them by their first names for clarity. No disrespect is intended.

by starting Owosen, which began its operations as a vehicle importer/exporter and expanded to include bus leasing.

While living in China, Frank met Yong Zhou through Zhou's sister, who was a client manager at a bank with which Frank did business. When Frank came to visit his son in January 2011, he spent a week with Zhou in Los Angeles. During this time, they discussed Zhou's businesses and whether there were investment opportunities for Frank. Zhou suggested a vehicle import and export business. Frank agreed to do business with Zhou and they established Owosen.[3] Several months later, Frank visited the United States again and Zhou introduced him to Liu. They discussed Liu's tour bus business, TBE, and how the number of buses TBE had was insufficient to meet demand. Liu suggested that Frank purchase additional buses which Liu could then lease from Frank. In the course of discussing Liu's business, Frank also met Liu's ex-wife, Betty Qi, who worked with Liu in the tour bus business and ran a travel agency. After four meetings, Frank decided to do business with Liu.

Owosen purchased five buses in 2011. The parties discussed and agreed that TBE would manage the five vehicles, and the net profits, after expenses, would be split 60 percent to

---

[3] Zhou worked at Owosen and managed the bus side of the business when Frank returned to China in 2011 and 2012. Sometime in the first half of 2012, Frank discovered that Zhou, who had authority to sign checks from Owosen, was using Owosen's checking account to pay for personal expenses and terminated his employment. John and another Owosen employee took over the management of Owosen.

Owosen and 40 percent to TBE (Contract One).[4] The parties also agreed that expenses for the operation of the buses would be paid from the income, including salaries, benefits, and insurance for employees of TBE, and that the agreement could be amended from time to time as agreed by the parties, and that it could be terminated if there was a material breach of the contract by either side. Although the parties subsequently executed a written lease agreement on April 28, 2011, this contract was written in English, in which neither Liu nor Frank is fluent, was prepared by Owosen and Frank's counsel without input from Liu as to the terms and did not reflect the parties' earlier meeting of the minds, except with the portion of the lease agreement that was consistent with the prior agreement.

The parties subsequently executed an undated attachment written in Mandarin, but this was not a new, binding agreement between the parties but intended as a document to support Frank's immigration application.

In the spring of 2012, Owosen purchased five additional buses. On April 4, 2012, Owosen and Liu, in an individual capacity, signed a contract written in Mandarin relating to the five new buses only (Contract Two). Contract Two was a new binding contract between Liu and Owosen, and its basic terms were that Liu was to be responsible for essentially all operating expenses, as to the five buses identified in it, in exchange for which Liu was required to pay Owosen the monthly sum of either $17,000 or $20,000, depending on the season. Thereafter, all

---

[4] Because Owosen does not challenge the referee's findings with respect to the substance of the parties' agreements, we rely on those findings in setting forth the terms of those agreements.

remaining income, or losses, was to be for the benefit or detriment of Liu. Under Contract Two, it was contemplated that Liu would use TBE and its personnel for logistical, management, and accounting services to assist in his performance of Contract Two. There was no agreed upon provision between Liu and Owosen or TBE and Owosen for a management or accounting fee payable to TBE for services rendered in connection with Contract Two. At some point around the time Contract Two went into effect, Liu became an employee of Owosen and received a salary.

In early 2013, Owosen notified Liu that he was $32,000 short on his monthly payments under Contract Two. Owosen subsequently sent letters to Liu requesting payment of the amount owed, which it now claimed was $83,000. In August 2013, Frank reached out to Qi for assistance in resolving the situation. Qi made additional payments to Frank. However, Frank stated that money was still owed under the contracts. Qi sent Frank the account details for May 2012 through August 2013, which Qi and Frank discussed at a meeting at the Owosen office. The reports did not match reports that Liu had provided Frank for the same period. Around this time, Liu quit his job with Owosen. Frank and Qi discussed the possibility of continuing Owosen and TBE's business relationship, with Qi managing the relationship for TBE, but they were unable to reach an agreement and Frank ultimately requested the return of the 10 buses. Several of the buses were still completing previously contracted tours at the time Frank demanded their return. All buses other than a Volvo bus, Owosen's most valuable bus, were subsequently returned. Liu asserted that the Volvo belonged to TBE.

## 2.    Procedural Background

In May 2014, Owosen commenced a lawsuit, alleging causes of action against TBE, Liu, Qi, Eric Investment, LLC, Queen Estates Holdings, LLC, Old Brooks Estates, LLC, and Eastland Estate, LLC.[5] It subsequently filed an amended complaint, which is the operative pleading. As is relevant to this appeal, Owosen asserted the following causes of action against defendants: (1) breach of Contract One; (2) in the alternative, for monies due on account stated as to Contract One; (3) breach of Contract Two; (4) in the alternative, for monies due on account stated as to Contract Two; (5) conversion as to the nine buses other than the Volvo. As to Liu and Qi, the operative complaint also asserted causes of action for fraud with respect to the Volvo bus and various documents, but Owosen chose not to pursue damages under the fraud causes of action at trial. TBE filed a cross-complaint against Owosen and Frank asserting five causes of action, but only the cause of action for breach of contract remained pending at the time of trial.

In 2017, the parties stipulated that the matter would be heard by a judicial referee, the Honorable R. Bruce Minto (Retired), pursuant to section 638. The parties also stipulated that the referee would hear and determine all matters, issues, and controversies among the parties, including all pretrial and post-trial matters.

---

[5] Owosen also alleged causes of action against Moxu Qi, Prevost Car (US) Inc., and TCF Equipment Finance, Inc, but later dismissed its causes of action against these parties. Judgment was entered in favor of Eric Investment, LLC, Queen Estates, LLC, Old Brooks Estates, LLC, and Eastland Estate, LLC as to Owosen's claims against these defendants. Owosen does not challenge this aspect of the judgment.

The trial was held in front of the referee in March 2019. The referee heard testimony from Frank, John, Liu, Qi, and the defendants' damages expert, Claudia Berglund. The parties also submitted six binders of exhibits, almost all of which were received into evidence by stipulation. The parties also stipulated that closing argument would be conducted through opening and reply briefs filed by both parties, and the parties also filed proposed statements of the case and findings of fact, after which the matter was submitted for decision.

The referee issued a 100-page statement of decision and recommended judgment (the Statement of Decision) in April 2020. The referee took over 300 pages of notes to aid in arriving at a decision. He noted that, "far more than in most cases, almost every fact was hotly disputed. It was almost as if the two camps lived in alternate universes on almost every issue, and sometimes the beliefs held in those universes even differed greatly from the written documents used to memorialize their own interpretations of the transactions between them." The referee did not accept any party's interpretation of the agreements and thus could not rely on the views of damages put forth by any party. He noted that the credibility of witnesses, particularly Frank, Liu, and Qi, was "of paramount importance in [his] decision." Considering all evidence, the referee found Liu "to be more believable regarding the terms of the agreements and the evolution of the business relationship between the parties" than Frank. The referee acknowledged that there were inconsistencies in Qi's testimony, but found that, in general, she had a higher level of credibility than most witnesses, including Frank and Liu, and that "[s]he had superior knowledge to any of the other witnesses . . . of the business and accounting side of the bus and tour industry in

general, and specifically regarding TBE's operations and finances." The referee found that the testimony of Berglund was "important" and "the most reliable evidence of the financial picture and damages between the parties." However, because relatively little time was allotted to her testimony and she was unable to provide a detailed explanation of her analysis, utilizing her data and exhibits to calculate damages consistent with the referee's interpretation of the contracts "was difficult and time consuming."

With respect to Owosen's claim that the defendants were liable to Owosen for the breach of Contract One, and for conversion and fraud based on the failure to return the buses after demand, the referee found that Owosen's cancellation of Contract One based on Liu's breach of Contract Two in his individual capacity was not justified and therefore his demand of the first five buses was not justified. The referee noted that the demand for the return of the buses within two days was not dictated by any contract between the parties. However, he found that Frank's demand to Qi and TBE was sufficient notice of termination of Contract One and Contract Two. The referee further found that the return of the nine buses within either approximately a week or eleven days was not unreasonable. However, the Volvo was never returned voluntarily and was eventually repossessed. The referee concluded that this delay was unreasonable, as was TBE's failure to return it to Owosen or the lender or to negotiate a compromise.

Owosen did not submit evidence concerning the diminution in value of the Volvo after the demand for its return was made, nor was there evidence concerning the number of miles put on the vehicle after the demand. The referee found that there was some

9

evidence that the Volvo continued to be used by TBE. In the absence of better evidence, the referee set the economic benefit to TBE for its unreasonable delay in returning the Volvo at $500.00 per day, or $15,000 per month. The referee concluded that 10 days would be a reasonable time in which to return the Volvo and thus measured damages beginning on October 3, 2013. The only information the referee had as to when the bus was repossessed is that it took place after the action was filed on May 6, 2014. The referee thus awarded seven months of damage against TBE and in favor of Owosen, for a total of $105,000. The referee also concluded that there was a breach of Contract One with respect to TBE's practice of deducting Lexus payments from Owosen's revenue and awarded Owosen three months' worth of payments on the Lexus, or $4,464.

      With respect to the first period of the parties' relationship, defined as "May 2011 through May/June 2012," or approximately the period after Contract One was entered into and the execution of Contract Two, the referee noted that whatever complaints Owosen had about the funds it received and whether they were consistent with the parties' agreement were not reduced to writing. Further, Zhou, who managed the relationship at the time, was not brought in to testify. There was also no evidence to support that, after John took over management of Owosen, he had sent any written objection to the absence of accounting reports from TBE or shortage with respect to payments that were due. The referee concluded that John's and Berglund's analysis both generally corroborated the accountings propounded by the defendants. With respect to Contract One, under which 60 percent of net profits were owed to Owosen, "the parties' course of conduct demonstrated that, broadly and generally, but with some

exceptions, during the first year, TBE collected the revenues derived from the tour bus operations, paid all expenses (except for driver salaries), deducted those expenses from the revenues, and then gave 60% of the net profits to Owosen each month."

The referee found that Owosen's damages analysis, presented through John, was less persuasive than Berglund's analysis. Specifically, John's analysis, which was set forth in Exhibits 77 and 78, failed to differentiate between revenue and expenses under Contract One and Contract Two. The referee concluded that, "[i]n totality . . . such exhibits make it almost impossible to determine the extent of income and expenses through the period [Contract One] was in effect, up to the time Contract Two took effect, and between [Contract One] and Contract Two during the second period of time when both were in effect." John unilaterally decided what revenues and expenses were related to the bus business, put those items in Exhibits 77 and 78, and redacted all other financial information. According to Berglund, Owosen redacted approximately 75 percent of the dollar amounts of financial data in its production to the defendants, making it difficult to verify the validity of his work. The referee concluded that this made it "impossible" for him to determine an accounting for Contract One and Contract Two from Owosen's exhibits alone or to determine which party, if any, breached the agreement or what the damages would be for such a breach.

The referee concluded that the accounting and testimony of Berglund preponderated and, accordingly, TBE underpaid Owosen during the first period of Contract One in the amount of $27,321.82 but declined to award interest on this amount.

11

Berglund's analysis did not reconstruct the gross income, gross expenses, and net income for the first five buses in the second period of May 2012 through August 2013. The referee attempted to use the protocol testified to by Berglund, although the primary document relied upon by Berglund was an exhibit written in Mandarin, for which Berglund had an English translation but the referee did not. The referee considered many different options, including finding that neither side had met their respective burden of proof, but ultimately attempted "to use the existing exhibits and testimony to determine to a reasonable degree of accuracy the issues surrounding the amounts owed under [Contract One] for the first five buses during the second period of the parties' business relationship." In light of these various limitations, the referee's analysis concerning the damages under Contract One in the second period "required applying some broad assumptions." Although these assumptions resulted in "imprecise conclusions," the referee concluded that his analysis met the standard of "to a reasonable probability."

The referee "assumed that income was earned approximately equally between the first set of five buses and second set" as the number of seats in both sets of buses were similar (153 seats for the first five buses and 132 to 140 seats for the five other buses). He further assumed that operating expenses were approximately equal for both sets of buses and assumed that the cumulative overpayment by TBE that Berglund calculated was attributable 50 percent to the first and second set of buses. It was also assumed that the expense identified as "Commission" in Exhibit 599 (which reflected Berglund's analysis of expenses, revenues, and net overpayment by TBE during the second period) was attributable 50 percent to the first set of buses

and 50 percent to the second set of buses. However, because TBE could not properly charge a "commission" under the terms of Contract One, this expense was "disallowed from the calculation of allowed expenses for the first set of five buses." The referee thus subtracted 50 percent of the expenses, less 50 percent of the "commission" charges, from 50 percent of the gross income, which yielded $298,370.79 in expenses attributable to the first set of buses in the second period. The referee then deducted that amount from 50 percent of gross revenues for the second period ($686,986.18), leaving a net revenue of $388,615.39, of which 60 percent, or $233,169.23, was Owosen's share.

The referee then turned to the amounts received by Owosen to determine whether TBE had paid all amounts owed or had overpaid. The referee took 50 percent of Owosen's gross receipts for the period ($617,250.85) and deducted 50 percent of the payments Owosen made for fuel, parking, and maintenance ($158,423.54), which were TBE's responsibility under Contract One. The referee determined that the amount received by Owosen with respect to the first set of buses in the second period was $458,827.31. Since Owosen's share was only $233,169.23, the referee concluded that TBE had overpaid by $225,658.08 with respect to the first five buses in the second period. The net award to TBE under Contract One was thus $88,872.26. The referee also concluded that TBE was the prevailing party with respect to Owosen's claims concerning Contract One.

With respect to Contract Two, the referee declined to adopt either side's arguments as to damages in light of his finding that the terms of Contract Two "governed the business and financial relationship between Owosen and . . . Liu as to the second five buses during the second period of time." However, the referee did

find that the analysis and opinions of Berglund preponderated in general. Although not prepared for this purpose, the referee relied on Exhibits 601, which Berglund based on Owosen's Exhibit 78, and Berglund's testimony pertaining to that exhibit. Adopting Berglund's analysis in Exhibit 601 with respect to the second set of buses, the court concluded that, TBE owed $305,000 in fixed monthly fee payments to Owosen as well as operating expenses (i.e., payroll, payroll taxes, workers' compensation, and insurance and repairs), which were shown to be $287,740.21, for a total of $592,740.21. Exhibit 601 showed that Owosen received $617,250.86 from TBE with respect to Contract Two during the second period, meaning that the overpayment to Owosen was $24,510.65. However, it was stipulated that only the cross-complaint of TBE remained in play and only with respect to Contract One, and thus no affirmative relief was awarded to Liu in connection with Contract Two.

With respect to future damages, the referee concluded that Contract Two was for a five-year term. However, he noted that Owosen had the burden of producing evidence as to what the damages would be to a reasonable probability, which was "substantially more complicated than $17,000 or $20,000 times the number of months remaining on the contract." He noted that, "[w]hile Owosen's income was fixed under Contract Two, its expenses could vary wildly, as past history has repeatedly shown, and current history corroborates." The referee further noted that every aggrieved party has a duty to mitigate damages and there was no evidence presented that Owosen had done so. The referee concluded: "On the totality of evidence presented, sufficient evidence was just not presented from which the Referee could calculate to any reasonable degree of confidence the net damages

14

[Owosen] suffered from September 2013, out approximately 3.5 years into the future. Without such evidence of future damages and mitigation, the Referee declines to award same." The referee further concluded that the term of Contract One was 36 months or three years and that Owosen terminated it without legal justification but declined to award future damages for the same reasons as Contract Two.

Owosen subsequently filed objections to the Statement of Decision as to both liability issues and damages. The referee found that most of the objections were inappropriate for the pending motions and "more in the nature of a motion for new trial, a JNOV, or renewed argument on issues that were before the Referee at the original trial and, in most cases, thoroughly briefed post-trial." He concluded that, with certain limited exceptions,[6] the findings in the Statement of Decision were "supported by the preponderance of the totality of the evidence presented by all sides." However, with respect to damages, the referee agreed with the parties that the total expenses used with respect to the second period of Contract One was inconsistent with Exhibit 599 and that an adjustment of $18,481.43 in Owosen's favor was appropriate. The referee also concluded that an additional award of $5,952 in favor of Owosen was appropriate with respect to the Lexus payments under Contract One.

---

[6] For example, the referee sustained in part the objection that there was ambiguity in the Statement of Decision insofar as he referred to both the written lease agreement in April 2011 and the oral contract that governed the parties' relationship (which we refer to as Contract One) as "The Lease." However, as the term was used numerous times in the Statement of Decision, the referee stated that context would be sufficient to determine which reference was intended.

Judgment was entered in April 2021 in favor of TBE in the amount of $64,438.83. Shortly thereafter, Owosen moved for a new trial pursuant to sections 659 and 657 and to set aside the judgment pursuant to section 663. Among other things, Owosen contended that there was no evidentiary basis to exclude insurance, driver's salaries, workers' compensation, and payroll taxes from the bus operating expenses for the second period for Contract One. These expenses were not included in Exhibit 599, on which the referee relied in calculating damages for Contract One in the period but were included in the referee's calculation of damages under Contract Two for the second set of buses. Owosen also argued that there was no evidentiary basis to exclude expenses that it paid for fuel, parking, and maintenance from the Contract Two calculations.

The referee denied Owosen's motions. He concluded that "[n]one of the issues raised by [Owosen] are clearly contrary to the preponderance of the evidence, such that a different result is compelled." He acknowledged that, "many, if not most, of the issues on which there were findings may be contrary to some of the evidence, but not the preponderance of the evidence as this referee determined that to be." The referee further concluded that, with respect to the request for a new trial, "no adequate showing was made as to what additional evidence would be presented, and why such evidence was not and could not have been presented in the original trial." The referee concluded that this was not an appropriate case to exercise his discretion to enter a different judgment or grant a new trial.

Owosen timely appealed the judgment and the referee's order denying the motions for new trial and to set aside the judgment.

16

## DISCUSSION

### 1. Substantial Evidence Review of the Referee's Award of Damages

Owosen does not contest the referee's conclusions with respect to the terms of the contracts. Rather, Owosen limits its challenges to the referee's determination of damages, specifically: (1) his exclusion or omission of certain categories of expenses in determining whether TBE had paid Owosen an adequate amount under the contracts; (2) his calculation of the amount that Liu overpaid to Owosen under Contract Two; and (3) his exclusion of bus fees for April 2012 and September 2013 from the calculation of damages under Contract Two. We agree with Owosen's first challenge and conclude that the judgment must be reversed in part with directions that judgment be entered against TBE and in favor of Owosen in the amount of $44,537.83. We otherwise conclude that the referee's damages analysis was consistent with the measure of damages and supported by substantial evidence.

#### 1.1. Standard of Review

"The applicable legal standard [for an award of damages] requires that the court use some reasonable basis of computation. [Citation.] An award of damages computed on a reasonable basis will be upheld even if it is only an approximation. [Citation.]" (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 402.) "Whether a plaintiff ' " ' "is entitled to a particular measure of damages is a question of law subject to de novo review." ' " ' [Citation.] The amount of damages, however, is a question of fact. The award will not be disturbed if it is supported by substantial evidence." (*Pebley v. Santa Clara Organics, LLC* (2018) 22 Cal.App.5th 1266, 1273.) The parties agree that the

17

substantial evidence standard applies to the damages issues raised by Owosen on appeal.

"In resolving challenges to a verdict based on sufficiency of the evidence, we review the record as a whole, resolving all conflicts and indulging all legitimate and reasonable inferences in favor of the prevailing part, to determine whether substantial evidence supports the verdict. [Citation.] 'Substantial evidence' in this regard does not mean 'any evidence.' Rather, to be 'substantial,' the evidence must be ' "of ponderable legal significance, . . . reasonable in nature, credible, and of solid value." ' [Citation.] If there is substantial evidence, contradicted or uncontradicted, that will support the finding, it must be upheld regardless of whether the evidence is subject to more than one interpretation. [Citations.]" (*Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 273, fn. 7.)

### 1.2. The Omission of Four Categories of Damages from the Calculation of Damages for the Second Period of Contract One

Owosen argues the referee's damages analysis was not supported by substantial evidence because it excluded insurance, driver salaries, workers' compensation, and payroll taxes for Contract One in the second period, even though these same expenses were included for the first period. Owosen contends that this error should be corrected by adding $287,740.21 to the expenses paid by Owosen, and which TBE was required to reimburse. This includes $55,116.74 for insurance, $158,674.90 for payroll, $23,106.76 for workers' compensation, and $50,841.82 for payroll taxes. These amounts are derived from Exhibit 601, which was prepared by the defendants' expert and based on Owosen's Exhibit 78. The defendants argue that Exhibit 601 was

meant only "to illustrate that even if the Referee relied on Owosen's suspect financial records, TBE still overpaid Owosen under the terms of their agreements." They assert that Exhibit 601 "did not, and was never meant to, suggest that the data set forth in Exhibit 78 were in any way trustworthy or accurate."

As a preliminary matter, it is unclear that Owosen's argument with respect to the exclusion of these four categories of expenses is a substantial evidence challenge. In *Scheenstra v. California Dairies, Inc.*, *supra*, 213 Cal.App.4th at page 404, the court observed that the defendant's contention "that the trial court excluded an item from the damage calculation, which caused the calculation to be wrong or incomplete under the measure of damages imposed by law" was a "legal argument" and "not really a substantial evidence argument."

To the extent this is a legal argument, there is no dispute that the referee interpreted Contract One as providing that TBE was responsible for all expenses and net profits were divided 60 percent to Owosen and 40 percent to TBE. Indeed, as Owosen points out, the referee expressly identified "salaries, benefits, and insurance for employees" as expenses that would be paid from the revenue TBE received before the parties split the profits. Exhibit 598, which the referee adopted as the damages owed by TBE to Owosen under Contract One in the first period, includes insurance, driver salaries, workers' compensation, and payroll tax expenses as TBE's responsibility. The Statement of Decision makes clear that Contract One remained in effect with respect to the first five buses in the second period. Nevertheless, these expenses are absent from Exhibit 599, which the referee used to

19

calculate damages with respect to Contract One in the second period.[7]

To the extent it is a question of fact, we conclude that substantial evidence did not support the omission of payroll, payroll tax, workers' compensation, and insurance expenses from the referee's calculation of damages under Contract One in the second period. There is no evidence that these expenses were not incurred in the second period. Rather, there is substantial evidence both of their existence and amounts.

Although the referee concluded that Berglund's analysis preponderated and that John's unilateral redactions of Owosen's financial records made it "impossible" for the referee to determine an accounting for Contract One and Contract Two from Owosen's exhibits alone, the record does not support that the referee entirely discredited Exhibit 78. Berglund testified that she reviewed the bank records underlying Exhibit 78 and concluded that approximately $895,000 of the expenses listed in it were reimbursable to Owosen, while approximately $620,000 were not. Exhibit 601 includes a total of $885,159.72 of expenses (not including the $305,000 in monthly fees due to Owosen under Contract Two). Thus, Exhibit 601 only included expenses from Exhibit 78 that Berglund confirmed were reimbursable. The

---

[7] Exhibit 599 was prepared to reflect the defendants' position that a new course of conduct applied to all 10 buses in the second period. Under that purported course of conduct, which the referee rejected, Owosen began paying bus-related expenses and TBE retained a fee of approximately $10,000 per month and remitted the balance (after deducting for its expenses) to Owosen. Thus, the exhibit was not intended to and did not reflect the terms of Contract One as understood by the referee.

referee expressly adopted Berglund's testimony regarding the reimbursable expenses included in Exhibit 78.

The referee opted not to attempt to calculate damages for the second period of Contract One using Exhibits 601 and 602 because they did not reflect the gross income of the first set of buses over both periods, but he relied on Berglund's testimony concerning Exhibits 601 and 602 and Exhibit 601 in calculating damages under Contract Two. With respect to Exhibit 601, Berglund testified that the payroll, payroll tax, workers' compensation, and insurance expenses for the second period (which totaled approximately $575,000) could be allocated between Contract One and Contract Two by dividing them in half. The record shows that the referee found the allocation and the amounts to be credible, as he used them to calculate damages for Contract Two. The defendants' contention that the figures in Exhibit 601 were "unverified" or unreliable is therefore inconsistent with the record. Incorporating the remaining 50 percent of these expenses attributable to Contract One for the second period does not implicate a reweighing of the evidence, but rather incorporates amounts approved by the referee in a manner consistent with the analysis he adopted for the first period.

The referee acknowledged that his approach to calculating damages for Contract One in the second period "clearly results in imprecise conclusions," but concluded that the damages calculated nevertheless met the standard of "to a reasonable probability." However, the omitted expenses were relevant to multiple steps of Berglund's analysis, which the referee adopted. First, they were relevant to determining the overall profit (determined by subtracting expenses from revenues) and the

21

parties' respective shares of the profit.[8] Additionally, because Owosen was also entitled to reimbursement of any expenses it paid, these expenses were subtracted from the payments Owosen received before determining whether it had received the profits to which it was entitled.

Nor were these minor expenses in the context of Berglund's analysis. Exhibit 598 shows that, taken together, payroll, payroll tax, workers' compensation, and insurance expenses constituted the majority (52 percent) of expenses for the first period.[9] There is no evidence in the record suggesting that these expenses did not constitute a similar proportion of total expenses in the second period. Indeed, when the figures for the four omitted categories of expenses in Exhibit 601 are added to the expenses in Exhibit 599 for the second period, they similarly comprise 51 percent of the total expenses. Thus, substantial evidence does not support these expenses could be omitted without calling into question the reasonableness of the referee's basis of computation.

In sum, we recognize the difficulties the referee faced in calculating damages in this case and commend his efforts and detailed analysis in the Statement of Decision, which greatly assisted our review. Nevertheless, considering the entire record, we cannot conclude that the referee's calculation of damages with respect to the second period of Contract One was consistent with

---

[8] As an illustration, if these four categories of expenses were omitted from Exhibit 598, the overall profit for the first period would jump from $218,848.68 to approximately $459,000, and Owosen's contractual share would increase from $131,309.21 to approximately $275,000.

[9] Together, insurance, driver salaries, workers' compensation, and payroll tax were $240,115.72 of the total expenses of $458,022.32 for Contract One in the first period.

the measure of damages he adopted, supported by substantial evidence, or that it reasonably approximated actual damages. We therefore agree with Owosen that the driver salary, payroll tax, workers' compensation, and insurance expenses in Exhibit 601 should have been included in the calculation of damages under Contract One in the second period.

As illustrated in Table 1 below, we conclude that $281,620.78 should be added to Owosen's reimbursable expenses, which reduces TBE's overpayment to Owosen in the second period of Contract One from $207,177 to $98,199.99.[10] The referee concluded that TBE underpaid by $27,321.82 with respect to Contract One in the first period and that TBE owed $105,000 in damages with respect to the Volvo bus and $10,416 in damages with respect to the Lexus bus, resulting in a total of $142,737.82 in damages owed by TBE to Owosen with respect to Contract One. When the $98,199.99 overpayment to Owosen is credited against this amount, damages under the first contract are $44,537.83 in Owosen's favor. We therefore reverse the judgment in part with directions that judgment be entered against TBE and in favor of Owosen in this amount.

---

[10] Owosen requests that we add $287,740.21 to the expenses for Contract One in the second period, including $55,116.74 for insurance. However, Exhibit 601 states that the figure of $55,116.74 comprises "Insurance *and repairs*." (Italics added.) To obtain that figure, Berglund added the totals for the columns "Repair/Tire/Parking" and "Bus Insurance" in Exhibit 78 for the second period and divided that amount in half. "Bus Insurance" expenses represented $48,997.31 of this amount, while the remaining $6,119.43 represented "Repair/Tire/Parking" expenses. Because maintenance and parking expenses are already reflected in Exhibit 599, we conclude that only $48,997.31 should be included for insurance expenses.

**Table 1: Corrected Damages for Contract One in the Second Period**

|  | Source Exhibit | Amount |
|---|---|---|
| **Gross Bus Revenues** | 599 | **$686,986.18** |
| **Expenses** |  |  |
| Fuel | 599 | $154,850.49 |
| Parking | 599 | $15,750.00 |
| Maintenance | 599 | $70,726.74 |
| Part Time Accountant | 599 | $8,000.00 |
| Miscellaneous | 599 | $18,241.18 |
| Payroll/Drivers Salaries | 601 | $158,674.90 |
| Payroll Taxes | 601 | $50,841.82 |
| Workers' Compensation | 601 | $23,106.76 |
| Insurance | 601 | $48,997.31 |
| **Total** |  | **$549,189.20** |
|  |  |  |
| **Profit (Revenues Less Expenses)** |  | **$131,677.55** |
| **Profits Due to Owosen (60 percent)** |  | **$79,006.53** |
|  |  |  |
| **Owosen's Gross Receipts** | 599 | **$617,250.85** |
| **Owosen's Expenses Paid (Reimbursable)** |  |  |
| Fuel, Parking, and Maintenance | 599 | $158,423.54 |
| Payroll/Drivers Salaries | 601 | $158,674.90 |
| Workers' Compensation | 601 | $23,106.76 |
| Payroll Tax | 601 | $50,841.82 |
| Insurance | 601 | $48,997.31 |
| **Total** |  | **$440,044.33** |
| **Gross Receipts Less Expenses Paid** |  | **$177,206.52** |
| **Overpayment by TBE** |  | **$98,199.99** |

### 1.3. The Exclusion of Fuel, Parking, and Maintenance Expenses from the Calculation of Damages Under Contract Two

Owosen observes that "[t]he Referee concluded that 'Mr. Liu was to be responsible for essentially all operating expenses, as to the five buses identified in [Contract Two], in exchange for which Mr. Liu was required to pay Owosen the monthly sum of either $17,000 or $20,000,' " and therefore contends that "[t]here is no question that fuel, parking, and maintenance (very large categories of bus operating expenses) are included in 'essentially all operating expenses' " and should have been included in the referee's analysis. Owosen states that this error can be remedied by adding $158,423.54 to the expenses for Contract Two. This amount is derived from Exhibit 599 and is 50 percent of the payments Owosen made for fuel, parking, and maintenance, which total $316,847.09.

The defendants argue that Owosen misrepresents the referee's findings with respect to Contract Two. They point out that the Statement of Decision states that "[t]he *basic* terms of Contract Two were that Mr. Liu was to be responsible for *essentially* all operating expenses, as to the five buses identified in it . . . ." (Italics added.) They argue that this was a shorthand for the terms of Contract Two but does not mean that Liu was responsible for virtually all expenses. By its own terms, Contract Two provides that Liu was responsible for: salaries and payroll tax; workers' insurance and benefits; "the bus, insurance, maintenance, upkeep, and accidents etc. and related fees in the course of normal operation"; and monthly contract fees of $17,000 or $20,000. Thus, while Contract Two expressly includes

maintenance costs, it does not state that Liu was responsible for fuel and parking costs.

We agree with the defendants that the referee's damages calculation included maintenance expenses. Although Owosen contends that Exhibit 601 "only includes expenses for insurance, driver salaries (payroll), workers comp, and payroll taxes," one of the categories of expenses listed in Exhibit 601 is "Insurance *and repairs*" (italics added). Exhibit 78 includes a column titled "Repair/Tire/Parking," which, together with the column entitled "Bus Insurance," formed the basis for the "Insurance and repairs" figure in Exhibit 601. Thus, Exhibit 601 does in fact include repair or maintenance expenses.[11]

With respect to fuel and parking expenses, this court has not been asked to determine de novo what the appropriate measure of damages is under Contract Two. We are concerned only with determining which party was responsible for fuel and parking expenses under the Statement of Decision and whether the calculation of damages awarded was consistent with that determination and supported by substantial evidence. Based on our review of the record, we conclude that the referee did not consider fuel and parking expenses TBE's responsibility under Contract Two.

In recounting the parties' position, the referee noted that the defendants opposed Owosen's position that "TBE was

_____

[11] Berglund does not reference parking when including these totals in Exhibit 601 and testified that it was her understanding that another column of the chart represented parking and fuel expenses based on the translations provided to her. It is therefore unclear what proportion of the expenses in the "Repair/Tire/Parking" column are attributable to parking.

responsible for 100% of expenses, including fuel and parking" under Contract Two. As the defendants point out, when summarizing his holding with respect to the provisions of the contract, the referee stated that Liu was responsible for "*essentially* all operating expenses." (Italics added.) Had the referee agreed with Owosen and concluded that Liu was responsible for 100 percent of expenses, including expenses not specifically set forth in the terms of the contract, he presumably would have said so, rather than using language indicating that there was at least one category of expenses that was not TBE's responsibility.

Further, the referee found Liu "to be more believable regarding the terms of the agreements and the evolution of the business relationship between the parties" than Frank. Liu testified that when TBE advanced payments for fuel and parking, it sought and received reimbursement from Owosen. Owosen argues that Liu's testimony that it would not be appropriate for TBE to seek reimbursement for fuel costs if TBE had already taken out those costs before remitting revenue to Owosen supports its position that Liu was responsible for fuel costs in the second period. However, this testimony seems to reflect Liu's agreement that it would be inappropriate to seek double payment for fuel expenses from Owosen, not that he was responsible for those payments. The referee also found that Qi generally had a higher level of credibility than both Frank and Liu and that "[s]he had superior knowledge to any of the other witnesses . . . of the business and accounting side of the bus and tour industry in general, and specifically regarding TBE's operations and finances." Like Liu, Qi testified that TBE received reimbursement from Owosen for fuel charges.

27

Additionally, Berglund testified that she disagreed with the inclusion of expenses for parking and fuel in Exhibit 78 because she did not believe them to be reimbursable expenses. The referee concluded that the defendants "demonstrated through the testimony of Ms. Berglund that [John] and Exhibit 78 overstated expenses by $620,000" and that the overstatement largely consisted of fuel and parking expenses. The referee's adoption of Berglund's analysis also indicates that fuel and parking expenses were not reimbursable expenses under his interpretation of Contract Two.

We therefore conclude that there is substantial evidence to support the exclusion of fuel and parking expenses from the referee's calculation of damages.

### 1.4. The Exclusion of Bus Fees for April 2012 and September 2013 from the Calculation of Damages under Contract Two

Finally, Owosen argues that the referee erred by determining that Liu overpaid it under Contract Two. Specifically, Owosen contends that the referee erred in relying on the monthly fee total set forth in Exhibit 601, which states that the total fees due were $305,000, because this excludes the months of April 2012 and September 2013.

The Statement of Decision notes that the handwritten date of April 4, 2012, was consistent with Liu's testimony as to when Contract Two was executed, but also states that Frank's testimony varied with respect to when Contract Two was executed and referred variously to April, May, or June 2012. The referee observed that "[e]ntering into the contract in anticipation of the designated buses being acquired or put in service is consistent with The Lease, which bears a date of April 4, 2011,

28

with the evidence being that, at least as to the Volvo coach, the bus was not actually acquired for a month or two." Thus, while the referee concluded that it was "more likely than not" that Contract Two was formally executed around April 4, 2012, he did not find that all buses were available for TBE's use at that time. Under the terms of Contract Two, Owosen was responsible for "[t]he timely purchase and payment for the models of buses selected by Party B, guaranteeing the normal operation of business." To the extent that Owosen failed to "guarantee[] the normal operation of business" by providing Liu the full second set of buses in April 2012, the referee could have reasonably concluded that no fee should be awarded for that month.

Owosen argues that the fact that revenues were higher in April 2012 than in March 2012 or any prior month demonstrates that the second set of five buses were already in use. Revenues for April 2012 ($85,400) were substantially higher than the revenues for March 2012 ($35,955). However, revenues varied significantly from month to month and March 2012 had the lowest revenues of any month of operation. Revenues in August through October of 2011 ranged from $67,510 to $70,085. The revenues in May 2012—after Owosen contends the full set of second buses were delivered to TBE—were $67,835 and thus in the same range of revenues that TBE had earned with the first set of buses alone. Thus, although Owosen has identified evidence indicating that the second set of buses was in operation in April 2012, "[w]e may not reweigh a judgment 'supported by substantial evidence even if substantial evidence to the contrary also exists.' [Citation.]" (*City of San Buenaventura v. United Water Conservation District* (2022) 79 Cal.App.5th 110, 120.)

With respect to the omission of the September 2013 fee from the expenses under Contract Two, the defendants argue that there was evidence that Liu had terminated the parties' relationship before September 2013, as well as evidence that the bus business only continued through September 2013 to fulfill existing contracts. However, in his discussion of damages under Contract Two, the referee states: "From April 2013 until cancellation of Contact Two on September 23, 2013, additional payments were due to Owosen of $117,000, consisting of the April 2013 payment at $17,000, and five months (May *through September 2013*) at $20,000 per month." (Italics added.) If this language left any doubt, the referee also included September in his calculation of the monthly payments due to Owosen between April and September 2013. Thus, the referee expressly concluded that a monthly fee was due to Owosen for September 2013.

Nevertheless, even accepting that the omission of the September fee from the damages calculation was not supported by substantial evidence, the referee calculated TBE's overpayment to Owosen under Contract Two at $24,510.65. Reducing this amount by $20,000 still results in a net overpayment by TBE, and thus does not alter the judgment against Owosen under Contract Two. Accordingly, with the exception of the partial reversal discussed above, the judgment is affirmed.

**2.     Motions to Set Aside Judgment and For a New Trial**

Owosen moved to set aside the judgment pursuant to section 663 and moved for a new trial pursuant to sections 659 and 657. We review a trial court's denial of motions to set aside the judgment and for new trial under the deferential abuse of discretion standard. (*Philippine Export & Foreign Loan*

30

*Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1076–1077; *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1018.) "In reviewing an order denying a motion for a new trial, we review the entire record, including the evidence, and independently determine whether any error was prejudicial." (*Crouch*, at p. 1018.)

Owosen's arguments in support of its motions are primarily the same as set forth above with respect to the calculation of damages. In light of our conclusion above that the judgment must be reversed in part and entered in Owosen's favor and against TBE in the amount of $44,537.83, Owosen's appeal is partially moot. With respect to Owosen's remaining arguments concerning the calculation of damages, we conclude that the referee did not abuse his discretion in denying the motions for the reasons set forth above and therefore affirm.

Owosen further contends that the referee erred in failing to award future damages with respect to Liu's breach of Contract Two and that a new trial is therefore appropriate. We conclude that the referee did not abuse his discretion in declining to award future damages or denying a new trial on this ground. The referee determined that, on the totality of the evidence presented, there was insufficient evidence from which he could calculate to any reasonable degree of confidence the net damages Owosen suffered from September 2013 to approximately 3.5 years in the future, and thus declined to award damages. For the same reason, the referee declined to award any future damages to TBE for Owosen's termination of Contract One without legal justification. The referee also found that there was no evidence that Owosen had mitigated its damages by exploring other options by which the buses could have made Owosen money.

Owosen contends that this was erroneous because Owosen's expenses in the leasing of its buses were minimal and fixed. However, as discussed above, the referee's discussion of Contract Two and calculation of damages demonstrate that he understood fuel and parking expenses to be Owosen's responsibility under Contract Two. His statement that Owosen had costs to bear under that contract which could "vary wildly" further supports that the referee did not consider Owosen's expenses under Contract Two to be limited to fixed personnel and office expenses. Owosen also represented that it did not intend to present new evidence on damages even if a new trial were granted. In the absence of additional evidence, we cannot see how the referee could have possibly determined Owosen's future damages under Contract Two. Thus, even if Owosen had mitigated damages (a question we need not reach), the referee's determination that Owosen failed to prove future damages to a reasonable probability and his denial of the motion for a new trial on this ground was not an abuse of discretion.

## DISPOSITION

The judgment is reversed in part with directions to enter judgment against TBE and in favor of Owosen in the amount of $44,537.83. In all other respects, the judgment is affirmed. The appeal of the order denying the motions for new trial and to set aside the judgment is affirmed in part and dismissed as moot in part. The parties shall bear their own costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                                    LAVIN, J.

WE CONCUR:


EDMON, P. J.


EGERTON, J.